<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

```
_____
                               :
RAUL J. STEVENS,               :
                               :   Civ. Action No. 12-3011 (RMB)
            Plaintiff,         :
                               :
      v.                       :      OPINION (FOR PUBLIC)
                               :
DONNA ZICKEFOOSE, et al.       :
                               :
            Defendants.        :
                               :
_____:
```

APPEARANCES:

Deepa J. Zavatsky, Esq.
Reed Smith LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
      Counsel for Plaintiff

Kristin L. Vassallo, Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
      Counsel for the Federal Defendants


**BUMB**, District Judge

        Plaintiff Raul J. Stevens, a prisoner incarcerated in FCI

Fort Dix, in Fort Dix, New Jersey, filed his Third Amended

Complaint ("TAC") in this action on November 9, 2015. (TAC, ECF.

No. 114.) Stevens alleged he made numerous, repeated requests for

medical attention to treat his severe conditions, and the medical

staff and Warden ignored his condition for several years, in violation of the Eighth Amendment. (TAC, ¶10.)

This matter comes before this Court upon the motion for summary judgment by Donna Zickefoose, Dr. Nicoletta Turner-Foster, Dr. Abigal Lopez, and Dr. Samir Sulayman (the "Federal Defendants") (Fed. Defs' Mot. for S.J., ECF No. 124). Defendants contend they are entitled to summary judgment for four reasons (1) Plaintiff's Bivens claim against Dr. Sulayman is barred by the statute of limitations; (2) Warden Zickefoose had no personal involvement in Plaintiff's medical care (3) Plaintiff cannot establish an Eighth Amendment violation; and (4) the Federal Defendants are entitled to qualified immunity. (Fed. Defs' Brief, ECF No. 124-3.)

Plaintiff opposed the motion for summary judgment. (Pl's Mem. of Law in Opp. to Mot. for S.J. filed by Defs. Zickefoose, Turner-Foster, Lopez, and Sulayman. ("Pl's brief," ECF No. 131.) The Federal Defendants filed a reply brief in support of their motion for summary judgment ("Fed. Defs' Reply", ECF No. 134.)

This Court has considered the pleadings, motions, briefs and supporting documents, and will decide the motion on the papers, pursuant to Federal Rule of Civil Procedure 78(b). For the reasons explained below, the Court will grant the Federal Defendants' motion for summary judgment.

I.    <u>Third Amended Complaint</u>

Plaintiff alleged Warden Zickefoose was generally responsible for the operations of FCI Fort Dix and:

> Zickefoose was further responsible for responding to the BP-9 complaints, and addressing any deficiencies in the policies and procedures leading to the medical treatment provided to Plaintiff. Ms. Zickefoose's intentional failure (and in fact, willful inaction) to properly investigate, audit and resolve Plaintiff's complaints created an environment in which there was an unreasonable risk of medical injury to Plaintiff.

(TAC, ¶19.)

Dr. Abigail Lopez is the Health Services Clinical Director at FCI Fort Dix. (<u>Id.</u>, ¶20.) She treated Plaintiff directly and oversaw his treatment by other staff. (<u>Id.</u>) Plaintiff alleged, as the Clinical Director, Dr. Lopez is responsible for his medical treatment. (<u>Id.</u>)

Dr. Nicoletta Turner-Foster specializes in internal medicine and is employed by the Federal Bureau of Prisons. (<u>Id.</u>, ¶21.) She treated Plaintiff at FCI Fort Dix in the relevant time period. (<u>Id.</u>) Dr. Samir Sulayman is also a physician who was employed by the Federal Bureau of Prisons, and he treated Plaintiff during the relevant time period. (<u>Id.</u>, ¶23.)

In summary, Plaintiff alleged liability of the Federal Defendants based on the following: (1) failure to transfer plaintiff to a federal medical center (TAC, ¶¶26-34); (2) failure

3

to identify Dr. Nugent's misdiagnosis of BPH and prostatic obstruction (Id., ¶¶54-96); (3) failure to explore other options after Dr. Nugent recommended a TUNA procedure (Id.); (4) failure to pursue a parallel neurological workup while he was being seen by Dr. Nugent (Id., ¶¶8, 54-96); (5) failure to obtain informed consent before Dr. Nugent performed the TUNA procedure (Id., ¶4, 106); (6) failure to provide proper follow-up treatment after the TUNA (Id., ¶¶117-144); (7) failure to treat or delay in treating his back/leg-related symptoms (Id., ¶¶9, 157-189); (8) delay in scheduling his visit with a neurologist (Id., ¶¶9, 134, 186, 190); (9) failure to obtain an MRI sooner (Id., ¶¶9, 199); and (10) failure to provide second medical opinions. (TAC, ¶¶238-239.) Plaintiff alleged he knew and repeatedly stated he was on the wrong course of evaluation and treatment, based on his symptoms. (Id., ¶238.)

## II.  Undisputed Material Facts

### A.  Plaintiff's Designation to FCI Fort Dix

On August 30, 2005, Plaintiff was sentenced in the Southern District of Texas to 274 months in prison, and the sentencing minutes form showed that the district court recommended Plaintiff be housed in a federal medical facility. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶11.) Upon his arrival at FCI Fort Dix, Plaintiff was designated a Care Level 2 inmate. (ECF No. 131-1 at ¶343.) Care Level 2 means the inmate is medically stable but

may require treatment for chronic conditions that are under control. (Id., ¶7.) Care Level 3 means the inmate is medically fragile and may require assistance with activities of daily living or monthly clinical evaluations. (Id.) Medical Staff did not recommend transfer to a Care Level 3 or 4 facility because they believed Plaintiff did not qualify. (Id., ¶344.)

A. Exhaustion of Administrative Remedies

Plaintiff submitted a BP-8 informal resolution form ("BP-8") on April 5, 2011, alleging he developed pain and other symptoms after a Transurethral Needle Ablation ("TUNA") procedure, and he received no response. (ECF No. 131-1, ¶345.) On May 9, 2011, a counselor responded to the BP-8 by stating Plaintiff was seen by medical staff and an urologist numerous times, and he was put on medication. (BP-8 Response, ECF No. 124-14 at 5.)

Plaintiff submitted a BP-9 Request for Administrative Remedy ("BP-9"), on May 9, 2011, complaining about his medical care. (BP-9, ECF No. 124-14 at 1-2.) Plaintiff requested "proper medical care" for symptoms of back pain, urinary, sexual and bowel symptoms. (Id.) Plaintiff stated, "I was only given pain medication and no definitive treatment." (Id. at 1.) Plaintiff theorized that his prostate and bladder were normal before the TUNA procedure, and his new symptoms were caused by the procedure. (Id. at 2.)

Warden Zickefoose responded to the BP-9 on June 20, 2011. (BP-9 Response, ECF 124-14 at 3.) She stated in her response "[a]

review of your medical records reveals that you have been under the care of the medical staff at FCI Fort Dix as well as a[n] Urologist for your diagnosis of benign prostatic hyperplasia." (Id.) She also directed Plaintiff to raise any issues or side effects at his chronic care visit in July 2011, or use sick call. (Id.) At FCI Fort Dix, typically someone from health services or a medical records technician prepares the response to a BP-9, for the warden's review. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶354.)

    B. Urology Treatment

     Plaintiff was 51-years-old when he arrived at FCI Fort Dix on September 14, 2006. (ECF No. 131-1, ¶12.) Dr. Dennis Nugent, who passed away in February 2015, was a private physician who contracted with the BOP to provide urological care to inmates from FCI Fort Dix. (Id., ¶¶34-36.) Dr. Nugent saw Plaintiff on September 12, 2007 to evaluate urinary symptoms and recommended diagnostic tests, which were approved by the prison's Utilization Review Committee "URC." (Id., ¶¶37-38) Dr. Nugent performed a cystoscopy on Plaintiff on May 19, 2008, and the operative note states "the only positive finding was prostatic obstruction. (Id., ¶¶49-50.) The urethra was obstructed by a small amount of lateral lobe tissue. (Id., ¶50.) Dr. Nugent said Plaintiff would be an ideal candidate for a Transurethral Needle Ablation ("TUNA"). (Id.)

When Plaintiff continued to complain of urinary symptoms in July 2008, Dr. Nugent diagnosed benign prostatic hyperplasia ("BPH") and lower urinary tract symptoms ("LUTS"), which include frequency, urgency, poor stream, and painful urination. (Id., ¶¶52-55.) Dr. Nugent prescribed Cardura (doxazosin). (Id., ¶54.) On July 22, 2008, Dr. Samir Sulayman prepared a consultation request for urology follow-up, based on Plaintiff's visit with Dr. Nugent. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶57-58.)



Dr. Sulayman saw Plaintiff only this once. (Id., ¶63.) His employment with FCI Fort Dix ended in January 2011. (Id., ¶65.)

Plaintiff saw Dr. Nugent again on October 8, 2008, and reported continued urinary symptoms and intolerance for doxazosin. (Id., ¶68.) Plaintiff agreed to the TUNA procedure. (Id.) Dr. Sulayman prepared the necessary request to the prison's URC for an urology follow-up, based on Dr. Nugent's recommendation for the TUNA procedure. (Id., ¶70.)

Plaintiff saw Dr. Nicoletta Turner-Foster for the first time on March 11, 2009, at the Chronic Care Clinic in FCI Fort Dix.

(Id., ¶75) Plaintiff reported chronic symptoms of urinary hesitancy and nocturia, and pain when urinating and defecating (Id., ¶76.) Dr. Turner-Foster did not refer Plaintiff to a neurologist because she wanted to complete the urology work-up first. (Id., ¶80.)

Plaintiff saw Dr. Turner-Foster again on September 2, 2009, and reported urinary hesitancy, nocturia and pain in his joints and entire back. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶85-86.) Plaintiff's neurological examination and gait were normal. (Id.) Dr. Turner-Foster ordered bloodwork and renewed Ibuprofen. (Id., ¶88.)

BOP medical providers do not obtain consent for procedures performed by specialists and expect the specialist to obtain consent. (Id., ¶94.) Dr. Nugent performed the TUNA procedure on Plaintiff in his office on September 22, 2009. (Id., ¶91.)

Plaintiff saw Dr. Nugent in follow-up on November 25, 2009, and Dr. Nugent noted that Plaintiff reported slight improvement since the TUNA. (Id., ¶¶99-100.) Plaintiff could not tolerate doxazosin, and Dr. Nugent prescribed Flomax. (Id., ¶¶100-101.)

On January 14, 2010, Plaintiff told Dr. Turner-Foster that his urinary symptoms persisted, and he had an adverse reaction to Flomax several weeks earlier. (Id., ¶¶111-13.) Plaintiff's neurological examination and gait were normal. (Id., ¶114.) Dr. Turner-Foster planned to have Dr. Nugent rule out possible scar

tissue in the bladder or urethra in Plaintiff's follow-up appointment in February. (ECF No. 131-1 at ¶115.) She renewed Ibuprofen and discontinued Flomax. (Statement of Undisputed Material Facts, ¶116.) In Plaintiff's follow-up with Dr. Nugent, his medications were changed, and Dr. Nugent recommended a urine culture. (Id., ¶¶119-20.)

Plaintiff was seen in sick call on April 27, 2010 for chronic constipation, and painful and difficult urination. (Id., ¶123.) Urine and blood tests were within normal limits (Id., ¶¶125-26.) An abdominal x-ray revealed no significant findings. (Id., ¶127.)

On May 5, 2010, Dr. Turner-Foster responded to an "Inmate Request to Staff" from Plaintiff about the TUNA procedure. (Id., ¶134.) Plaintiff wrote that the TUNA was a total failure, and he could not have a normal bowel movement or urinate without pain. (Id., ¶136.) He asked for an MRI, colonoscopy and stool culture. (Id., ¶137.) Dr. Turner-Foster responded by noting Plaintiff had just been hospitalized for bowel pain, and he was diagnosed with diverticulosis, after having a colonoscopy. (Id., ¶138.) She prescribed medication for constipation, naproxen for pain, and discontinued Flomax. (ECF No. 131-1 at ¶¶141-42.)

Plaintiff saw Dr. Nugent in May 2010, for continuing urinary symptoms. (Id., ¶¶147-48.) Dr. Nugent recommended a transurethral resection of the prostate ("TURP"), but Plaintiff refused. (Id., ¶149.) Dr. Nugent prescribed Hytrin, and recommended follow-up in

six months. (Id., ¶150.) Dr. Lopez believed it was appropriate to continue Plaintiff in urology care, rather than pursue a neurology work-up. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶153.) Several months later, Dr. Turner-Foster continued Plaintiff's medications for urinary and stool symptoms. (Id., ¶167.)

On November 17, 2010, Plaintiff told Dr. Nugent that he suffered lower back pain, difficulty voiding, difficulty walking, and a burning sensation in his legs. (Id., ¶¶177-78.) Dr. Nugent recommended a neurology consultation to rule out lumbosacral disk disease. (Id., ¶179.) Dr. Turner-Foster requested approval of the neurology consultation on Plaintiff's behalf. (Id., ¶185.) Dr. Lopez denied the request on March 5, 2011, because Plaintiff self-reported that he engaged in an extensive workout routine without difficulty. (Id., ¶186.)

In the next follow-up with Dr. Nugent in August 2011, Plaintiff told Dr. Nugent about his spinal tumor. (Id., ¶¶202-04.) Dr. Nugent recommended a neurosurgical consultation to rule out neurogenic bladder. (Id.) on October 18, 2011, Dr. Lopez approved the MRI request and the request for neurosurgical consultation. (Id., ¶209.)

Plaintiff continued to complain of urinary symptoms in April 2012, and he was scheduled for urodynamic testing and a CT scan to rule out a pelvic mass. (Id., ¶¶238-40). Plaintiff was unable to

tolerate a catheter, which was required for urodynamic testing and diagnosis of neurogenic bladder. (Id., ¶247.) Plaintiff's abdominal ultrasound showed diverticulosis and gall stones, but no mass. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶246.) Dr. Nugent prescribed new medications in August 2012. (Id., ¶248.)

 Dr. Patel told Plaintiff he had to stop using ibuprofen because it inflamed the colon and led to rectal bleeding. (Id., ¶309.)

In May 2015, Plaintiff declined catheterization of his bladder to treat his urinary symptoms. (Id., ¶317.) Several months later, he changed his mind. (Id., ¶333.)

FCI Fort Dix medical staff arranged for Plaintiff to be examined on October 15, 2015, by Dr. Simon Hanft, Professor of Neurosurgery and Director of Spinal Oncology at Rutgers-Robert Wood Johnson Medical School. (Id., ¶336.) 



███████████████   ████████████████ Dr. Hanft would only consider doing surgery if Plaintiff underwent urodynamic testing and assessment of sphincter tone, providing strong evidence of a neurological cause. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶338.) Dr. Hanft was unconvinced that the tumor was the cause of Plaintiff urinary and fecal problems, and he knew it was not the cause of Plaintiff's back pain. (Id., ¶339.) Plaintiff saw an urologist in December 2015, Dr. Russell Fried, who recommended diagnostic tests for hypotonic neurogenic bladder. (Id., ¶341.)

B.   Back Treatment

Upon his arrival at FCI Fort Dix, Plaintiff reported that he had a history of arthritis in his back, and spinal cord tumor with atrophy of the left leg. (Id., ¶¶12-13.) He was evaluated by x-rays and blood tests, and prescribed pain medication. (Id., ¶¶14-15.) ███████████████████████████████████████████████████

████ ████ ████ ███ ████ ████ ████ ███████ ████ ████

█████████████████████████████████████████████████████

███ ████ █ ██████ ████ ███ ██████ ████ ████ ████ ██ █

█████████████████████████████████████████████████████

███████████ Dr. Chung believed the atrophy in Plaintiff's calf was likely caused by his bypass surgery, and that a neurology consultation was not appropriate because Plaintiff had no motor function change or significant neurological symptoms. (Id., ¶48.)

Plaintiff saw Dr. Sulayman in the Chronic Care Clinic at FCI Fort Dix on August 5, 2008, and reported back pain and a history of spinal tumor, for which he had refused surgery in the 1990s. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶60.) Dr. Sulayman prescribed Motrin for pain. (Id., ¶61.)

On March 11, 2009, Plaintiff told Dr. Turner-Foster that he suffered pain in his joints and entire back. (Id., ¶76.) Dr. Turner-Foster noted Plaintiff had hammertoes but otherwise a normal neurological exam, and normal gait. (Id., ¶77.) She renewed Plaintiff's prescription for Ibuprofen. (Id., ¶78.)

On August 7, 2009, Plaintiff was seen in sick call and reported he had spinal tumor for which he refused treatment in the past. (Id., ¶81.) X-rays were ordered to evaluate his back and neck pain. (Id., ¶82.) The x-rays showed mild slippage in the lower back, and degenerative joint disease in the neck and mid-back. (Id.) Plaintiff was treated with ibuprofen. (Id.)

On December 24, 2009, Plaintiff was seen in Health Services for dizziness, headache, and back pain radiating down his legs. (Id., ¶105.) ████████████████████████████████

████████████████████████████████████████

████ On January 14, 2010, Plaintiff saw Dr. Turner-Foster, who noted ibuprofen helped Plaintiff's back and joint pain, although he experienced aching every day. (Id., ¶112.)

On May 24, 2010, Plaintiff wrote an Inmate Request to staff, complaining about back pain down his legs to his feet, and he requested an MRI and EMG. (Id., ¶154.) Dr. Turner-Foster responded on June 23, 2010, and noted Plaintiff had been evaluated in the clinic for these issues. (Id., ¶¶154-55.)

Plaintiff reported to sick call on July 15, 2010, complaining of sharp pain radiating down his right leg. (Id., ¶156.) His prescription for naproxen was renewed. (Id., ¶157.) Later that month, Plaintiff said he wanted to know if his preexisting tumor had increased in size. (Id., ¶160.) He was advised to continue with naproxen, and x-rays of his mid-back were ordered but came back normal. (Id., ¶161.)

On August 4, 2010, Plaintiff complained to Dr. Turner-Foster of joint and back pain. (Id., ¶164.) The pain decreased somewhat with naproxen. (Id.) Plaintiff described his work-out routine, including leg extensions, bench press, bicep curls, shoulder extension, trapezius, and Nordic Track for 20 minutes, five times a week. (Id., ¶165.) Plaintiff's neurological exam was normal. (Id., ¶166.) Dr. Turner-Foster prescribed indomethacin and levetiarcetam for Plaintiff's back pain. (Id., ¶167.)

On August 19, 2010, Plaintiff went to sick call for severe neck, back and leg pain that started when he was mopping. (Id. ¶¶168-69.) He underwent x-rays of his neck and mid-back, which

14

showed only degenerative changes, and his pain was treated with a Ketorolac injection. (Id., ¶170.)

On October 23, 2010, Dr. Turner-Foster responded to Plaintiff's August 2010 Inmate Request to Staff, asking for an MRI and removal of his spinal tumor because his back pain was severe. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶174-75.) She told him to sign up for sick call to discuss this. (Id., ¶176.)

Plaintiff saw Dr. Turner-Foster again on January 28, 2011, and she prescribed gabapentin for his nerve pain. (Id., ¶¶181-84.) She also requested that Plaintiff have a consultation with a neurologist, based on Dr. Nugent's recommendation. (Id., ¶185.) Dr. Abigail-Lopez denied the request on March 5, 2011, because she felt it was unnecessary based on Plaintiff's description of his exercise routine. (Id., ¶186.)

Plaintiff was assigned a new primary care physician on July 13, 2011, Dr. Pradip Patel. (Id., ¶193.) Dr. Patel requested a neurosurgical consultation and an MRI due to Plaintiff's symptoms of left leg weakness, atrophy, radiculopathy and bladder dysfunction. (Id., ¶196.) Dr. Lopez denied the request for an MRI on July 30, 2011, because the request was not justified under the Interqual criteria. (Id., ¶198.) However, she approved the request in October. (Id., ¶209.)

Dr. Patel also requested a CT scan of Plaintiff's lumbar spine on October 21, 2011, and the procedure was performed on November

9, 2011. (Id., ¶¶214-15.) The scan showed moderate to marked narrowing (stenosis) of the lumbar canal, disk bulges, herniations and kidney stones. (Id., ¶216.)

Plaintiff underwent an x-ray for MRI clearance on December 20, 2011, and the x-ray showed a metallic density near his left sinus. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶217.) Therefore, St. Francis Medical Center, which performed MRIs for FCI Fort Dix, refused because it could dislodge the metallic object. (Id., ¶¶218-19.)

Plaintiff was evaluated by neurosurgeon Dr. Anthony Chiurco the next day. (Id., ¶220.) Dr. Chiurco believed stenosis was causing Plaintiff's left leg symptoms, and he recommended lumbar decompression (laminectomy). (Id., ¶223.) The request for the procedure was approved on February 10, 2012. (Id., ¶225.) The surgery was performed on March 26, 2012. (Id., ¶235.)

After his lumbar laminectomy, Plaintiff continued to receive evaluation and treatment for his complaints of back, neck and leg pain. (Id., ¶¶240, 250-51, 254, 158, 264, 266, 268, 270.) In November 2013, Plaintiff said he did not want to take any medication for his bowel or back pain. (Id., ¶276.)

FCI Fort Dix arranged to have U.S. Mobile Imaging come to the prison in March 2014, to perform MRIs on Plaintiff's lumbar and thoracic spine. (Id., ¶¶280-81.) The thoracic MRI showed a cerebrospinal fluid mass, four centimeters in length. (Id., ¶281.)

16

A contrast MRI was ordered to rule out growth of the mass. (Id., ¶282.) Additional MRIs of Plaintiff's spine were performed. (Id., ¶¶289, 294-96, 302-03.)

Plaintiff underwent a neurosurgical evaluation with Dr. Chiurco in February 2015. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶305.) Dr. Chiurco told Plaintiff that his diffuse symptoms were not related to the spinal mass shown on the MRI, which had been present for twenty years. (Id.) In April 2015, Plaintiff underwent repeated MRIs of the thoracic and lumbar spine. (Id., ¶¶312-13.)

Plaintiff saw Dr. Chiurco again in May 2015. (Id., ¶¶321-25.) Dr. Chiurco did not believe Plaintiff's progressive symptoms could be attributable to the tumor. (Id., ¶322.) However, Plaintiff could have the tumor removed based on his increasing sphincter symptoms. (Id., ¶323.) The surgery might result in permanent incontinence of urine and stool. (Id., ¶325.) Plaintiff was willing to undergo surgery because his bowel symptoms had not improved. (Id., ¶328.)

In October 2015, Dr. Simon Hanft, Professor of Neurosurgery and Director of Spinal Oncology at Rutgers-Robert Wood Johnson Medical School, would only consider doing surgery to remove Plaintiff's spinal tumor if Plaintiff underwent urodynamic testing and assessment of sphincter tone, and the testing showed a strong indication of a neurological cause. (Id., ¶338.) Dr. Hanft was unconvinced that the lesion was the cause of Plaintiff's urinary

and fecal problems, and he knew it was not the cause of Plaintiff's back pain. (Id., ¶339.)


III. DISCUSSION

    A.   Summary Judgment Standard

Summary Judgment is proper where the moving party "shows there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999). The moving party has the burden to show there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

A party asserting that a fact is genuinely disputed must support the assertion by citing materials in the record, including depositions, documents, affidavits or declarations or other materials. Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "If a party fails to properly support an assertion of fact . . . the court may . . . grant summary judgment . . ." Fed. R. Civ. P. 56(e).

In determining whether there is a genuine dispute of a material fact, the court must view the facts in the light most

18

favorable to the non-moving party and make all reasonable inferences from those facts. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). A fact raises a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

B.   <u>Bivens Claims Against Dr. Sulayman</u>

The Federal Defendants contend Plaintiff's Bivens claim against Dr. Sulayman, who treated Plaintiff once in 2008, is barred by the two-year statute of limitations because Plaintiff filed this action on May 16, 2012. (Fed. Defs' Brief, ECF No. 124-3 at 42-43.) Plaintiff contends that he did not know or have reason to know of his injury caused by Dr. Sulayman until 2011, therefore, his claim is not barred by the statute of limitations. (Pl's Brief, ECF No. 131 at 14.)

Plaintiff contends he did not discover the basis for his lawsuit until July 13, 2011, when Dr. Patel diagnosed Plaintiff as having significant potential neurological issues which likely contributed to his urological symptoms. (ECF No. 131 at 16.) Plaintiff states "[t]his was the first time in approximately five years of treatment that any of the Defendants had acknowledged any potential treatment or cause of Plaintiff's problems outside of the singularly-focused course of urology." (<u>Id.</u>) He asserts that Dr. Sulayman perpetuated Dr. Nugent's misdiagnoses by not

19

independently verifying the diagnoses or exploring alternatives. (Id. at 14.)

The Court need not determine when Plaintiff's Bivens claim against Dr. Sulayman accrued because Plaintiff has not stated an Eighth Amendment claim of deliberate indifference to his serious medical needs by Dr. Sulayman. "[D]eliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). Deliberate indifference may be found when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

The deliberate indifference standard is met "when a doctor is 'intentionally inflicting pain on [a] prisoner[].'" Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990)). Deliberate indifference can also be shown where the denial or delay in granting a reasonable request for medical treatment subjects the prisoner to undue suffering or threat of tangible residual injury. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987). Medical malpractice, however, does not satisfy the deliberate indifference standard. Id. at 835 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

20

No reasonable juror could find deliberate indifference to Plaintiff's serious medical needs based on Plaintiff's one encounter with Dr. Sulayman in August 2008. ███████ ████ ██ ███ ████ ████ ██ ██ ████ ███████████████ The fact that Plaintiff told Dr. Sulayman he was diagnosed with a spinal tumor in the 1990s is insufficient evidence that Dr. Sulayman was deliberately indifferent by not associating Plaintiff's present symptoms, almost twenty years later, to the tumor and take immediate action on this basis. Dr. Sulayman's only other involvement in Plaintiff's medical care was to make written requests for approval of tests and treatment recommended by Dr. Nugent. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶57-58.)

Additionally, Dr. Sulayman was not deliberately indifferent by failing to question whether Dr. Nugent, a specialist, had correctly evaluated and treated Plaintiff's urological symptoms. Plaintiff's claim that Dr. Sulayman failed to consider whether his urological symptoms had a neurological cause sounds in negligence rather than deliberate indifference. Negligent medical care by prison medical staff is insufficient to support a constitutional violation. Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) (citing Estelle, 429 U.S. 97, 104.) Having failed to assert facts supporting deliberate indifference to his serious medical needs,

the Court will grant summary judgment to the Federal Defendants on Plaintiff's Eighth Amendment claim against Dr. Sulayman.

C.   <u>Bivens Claims Against Warden Zickefoose</u>

The Federal Defendants contend Plaintiff may not rely on the warden's supervisory position to hold her liable for an alleged constitutional violation in which she had no personal involvement. (Fed. Defs' Brief, ECF No. 124-3 at 45.) Responding to or reviewing an inmate grievance does not establish personal involvement in an Eighth Amendment deliberate indifference claim. (<u>Id.</u>, at 46.)

Plaintiff also alleged Warden Zickefoose sent a medical records Technician, Steven Ruff, to threaten Plaintiff that if he did not sign and resolve his BP-9 Administrative Remedy Request, he would not be allowed to see any doctors. (<u>Id.</u>, at 47.) The Federal Defendants assert Zickefoose is entitled to summary judgment on this claim because Plaintiff admitted that he only believed Warden Zickefoose was behind this, but he had no way of knowing this. (<u>Id.</u>)

In opposition to summary judgment, Plaintiff asserts personal involvement in a constitutional violation can be shown through allegations of personal direction or actual knowledge and acquiescence. (Pl's Brief, ECF No. 131 at 19.) Plaintiff relies on Zickefoose's failure to respond to his remedy request, and his allegation that Zickefoose sent Ruff to stop Plaintiff from filing further administrative claims. (<u>Id.</u> at 20-21.) Therefore,

Plaintiff asserts Zickefoose created an environment where his injuries would be exacerbated by improper treatment. (Id. at 21.)

Plaintiff also asserts Zickefoose falsely stated, in a response to his BP-9 on June 20, 2011, that she had reviewed his medical records and acknowledged his complaints. (Id. at 21-22.) Plaintiff asserts Zickefoose did not personally review his medical records or conduct any type of investigation into his complaints. (Id. at 22.) Thus, he asserts she perpetuated his improper medical treatment. (Id.)

There is no support in the record for Plaintiff's claim that Warden Zickefoose falsely stated she personally investigated Plaintiff's claims. In her BP-9 response, Zickefoose stated only that a review of his medical records was performed and revealed Plaintiff was receiving evaluation and treatment for his medical concerns. (BP-9 Response, ECF 124-14 at 3.) There is no constitutional violation when a warden delegates to medical staff the duty to review medical records in order to respond to an inmate grievance. Non-medical prison officials are not "deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer, 991 F.2d at 69 (3d Cir. 1993). There is no constitutional right to prison grievance procedures. Heleva v. Kramer, 214 F. App'x 244, 247 (3d Cir. 2007).

23

Furthermore, based on Plaintiff's deposition testimony, his allegation that Zickefoose ordered Ruff to threaten him is purely speculation on Plaintiff's part. (Stevens Dep. 1, pp. 170-76, 181-84, ECF No. 124-6 at 43-46; Stevens Dep. 2, pp. 113-15, ECF No. 124-7 at 29.) Plaintiff admitted there is no way he could know this happened; he merely assumed it happened behind closed doors between Ruff and the warden. (Id.) "[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citing Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)).

Most importantly, the undisputed material facts concerning Warden Zickefoose's involvement in the alleged deliberate indifference to Plaintiff's serious medical needs are that (1) Zickefoose became aware of Plaintiff's concerns about his medical care through his grievances; (2) Zickefoose did not personally investigate Plaintiff's grievances; and (3) she did not intercede to provide Plaintiff with the treatment he felt he needed because he was receiving treatment from the prison medical staff.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Plaintiff claims that Zickefoose acquiesced in mistreatment by

24

medical staff by not providing a remedy. Non-medical prison officials are not deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer, 991 F.2d at 69. Prison officials are entitled to give deference to medical authorities in diagnosing and treating patients. Pierce v. Pitkins, 520 F. App'x 64, 66 (3d Cir. 2013). "If an official's only involvement is the investigation or adjudication of an inmate grievance after the event giving rise to the grievance has happened, that is not considered to be personal involvement." Sims v. Wexford Health Sources, No. 15-2739, 2015 WL 9267942 at *2 (3d Cir. 2015) (citing Rode v. Dellaciprete, 824 F.2d 1195, 1207-08 (3d Cir. 1988)). For these reasons, the Court will grant summary judgment to the Federal Defendants on Plaintiff's Eighth Amendment claim against Warden Zickefoose.

D.   Bivens Claims Against Dr. Turner-Foster and Dr. Lopez

The remaining Federal Defendants are Dr. Nicolleta Turner-Foster and Dr. Abigail Lopez. The Federal Defendants assert that no reasonable jury could find that they were deliberately indifferent to Plaintiff's serious medical needs. (Fed. Defs' Brief, ECF No. 124-3 at 49.) Plaintiff was provided extensive medical treatment for his complaints, and disagreement with a course of treatment does not rise to the level of a deliberate indifference claim. (Id., at 49-52.) Moreover, the Federal

Defendants are not responsible for the performance of the TUNA procedure, which was performed by an outside specialist. (Id., at 54.)

The Federal Defendants contend that failure or delay in referring an inmate to a specialist or obtaining a diagnostic test cannot support a claim for deliberate indifference. (Id., at 55-56.) They also argue that Plaintiff cannot establish an Eighth Amendment claim based on failure to transfer him to a Federal Medical Center, because the decision was based on professional judgment that he was a Care Level 2 inmate who did not require greater care. (Id. at 56.)

Finally, the Federal Defendants assert Plaintiff cannot succeed on a claim that the BOP failed to provide a system to address his complaints and to allow him to seek a second medical opinion because Plaintiff received a response to his BP-9 grievance, and he was provided constitutionally adequate medical treatment. (Id. at 56-57.)

Plaintiff responds that there is ample evidence the Federal Defendants recklessly disregarded his serious medical needs by not providing a neurological consultation earlier. (Pl's Brief, ECF No. 131 at 28-31.) He failed to receive treatment for a known and previously diagnosed spinal tumor, despite his repeated complaints and requests for treatment. (Id. at 34-35.) Additionally, the Federal Defendants denied Dr. Nugent's recommendation for a

26

neurology consultation, although they professed to rely on his expertise. (Id. at 35-36.) Plaintiff contends that "a reasonable juror could find deliberate indifference when the tests Defendants conducted do not allow a physician to rule out certain possible causes." (Id. at 36.)

In reply, the Federal Defendants argue that Plaintiff is attempting to create a constitutional dimension to medical malpractice claims by alleging they recklessly disregarded a risk of harm by pursuing urological treatment. (Fed. Defs' Reply, ECF No. 134 at 12.) Disagreement with Dr. Turner-Foster's professional judgment of prioritizing the most likely cause of Plaintiff's symptoms, and ruling the most likely cause out before moving on to the next likely cause, cannot establish an Eighth Amendment violation. (Id. at 13.) The Federal Defendants were not required to second guess Dr. Nugent's diagnosis. (Id.)

The Federal Defendants further dispute Plaintiff's contention that a jury could find they were deliberately indifferent to finding the real cause of Plaintiff's symptoms, after it was obvious that urology treatment was ineffective. (Id. at 14.) They contend this argument overlooks undisputed facts that: (1) Plaintiff has received the neurological care he claims he should have received earlier; and (2) the specialist who examined Plaintiff in December 2015 was uncertain that Plaintiff's spinal mass was causing his urinary symptoms or back pain. (Id. at 14.)

27

Thus, if outside experts cannot pinpoint the cause of Plaintiff's symptoms, they cannot be liable under Bivens for failing to refer Plaintiff to an expert for such evaluation sooner. (Id.)

There is no dispute that Plaintiff had serious medical needs. In the Third Amended Complaint, Plaintiff alleged ten reasons the Federal Defendants are liable for deliberate indifference to his serious medical needs. First, Plaintiff asserted that his sentencing court recommended his designation to a federal medical facility, and the Federal Defendants ignored the sentencing court's order. (TAC, §§26-38.)

By statute, 18 U.S.C. § 3621(b), the Federal Bureau of Prisons, not a prison's medical staff, makes the initial determination of where a prisoner is housed upon sentencing. See Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 239 (3d Cir. 2005) (quoting 18 U.S.C. § 3621(b)). Thus, Dr. Turner-Foster and Dr. Lopez, the remaining Federal Defendants, are not liable for failing to designate Plaintiff to a federal medical facility.

Moreover, Dr. Turner-Foster and Dr. Lopez were not deliberately indifferent to Plaintiff's serious medical needs by failing to transfer Plaintiff to a higher level of care facility. Although Plaintiff disagreed, they exercised their professional judgment in concluding Plaintiff was a Care Level 2 inmate whose chronic conditions could be managed at FCI Fort Dix. (Statement of Undisputed Material Facts, ECF No. 131-1 at ¶¶343-44.) "[A]s long

28

as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) (quoting Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982)).

The second example Plaintiff put forward as deliberate indifference of the Federal Defendants is their failure to identify Dr. Nugent's misdiagnosis of BPH and prostatic obstruction. Even assuming Dr. Nugent's diagnosis was incorrect, a claim of misdiagnosis sounds in negligence and does not constitute deliberate indifference. Weigher v. Prison Health Services, 402 F. Appx. 668, 670 (3d Cir. 2010).

The third basis Plaintiff asserted as deliberate indifference by the Federal Defendants was their failure to explore other treatment options after Dr. Nugent recommended a TUNA procedure to treat his urological symptoms. This argument fails for two reasons. Plaintiff's argument is inaccurate because Plaintiff was in fact treated with medication for his symptoms for months before he decided to undergo the TUNA procedure. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶54.) Plaintiff's argument fails for another reason. The Eighth Amendment does not guarantee an inmate the medical treatment of his choice. See Santos v. Byunchack, 549 F. App'x 59, 60 (3d Cir. 2014) (citing Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)). A plaintiff's disagreement with a particular course of treatment does not give

rise to a constitutional claim. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).

Plaintiff's fourth grounds for deliberate indifference by the Federal Defendants is their failure to pursue a parallel neurological workup while he was being seen by Dr. Nugent. This argument also falls short. Dr. Turner-Foster did not find any neurological deficits when she examined Plaintiff. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶77, 66.) She exercised her professional judgment to rule out the most likely cause of Plaintiff's urological symptoms before pursuing another avenue. (Turner-Foster Dep., pp. 217-20, ECF No. 124-10 at 55-56.) Courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... (which) remains a question of sound professional judgment." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (citations omitted). "Certainly, no claim is presented when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several ways to treat an illness." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).

Plaintiff's fifth basis to impose liability on the Federal Defendants for a constitutional violation is failure to obtain informed consent for the TUNA procedure. In her deposition, Dr. Turner-Foster stated the prison medical staff did not typically obtain informed consent for procedures performed by an outside

30

specialist. (Turner-Foster Dep., pp. 156-57, ECF No. 124-10 at 40.) Dr. Turner-Foster and Dr. Lopez were not personally involved in the alleged misconduct because they did not perform the TUNA procedure, nor are there any facts suggesting they knew Dr. Nugent performed with procedure without informed consent.

Plaintiff next alleged deliberate indifference due to the Federal Defendants' failure to provide proper follow-up treatment after the TUNA. (TAC, ¶¶117-144). Dr. Turner-Foster regularly provided Plaintiff follow-up care when he complained of symptoms after the TUNA procedure, often prescribing medications for his symptoms and referring him for further care by Dr. Nugent. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶114-16, 118-20, 141-42.) ███ ███ ████ ████ ███ ████

████████████████████████ ████████████

████████████████████████████

█ ██ █████ "No claim of deliberate indifference is made out where a significant level of care has been provided, and all that is shown is that the prisoner disagrees with the professional judgment of a physician. . . ." Hairston v. Director of Bureau of Prisons, 563 F. Appx 893, 895 (3d Cir. 2014.)

Plaintiff also advanced three closely related bases for deliberate indifference by Dr. Turner-Foster and Dr. Lopez: (1) they delayed treating his back and leg pain symptoms; (2) delayed scheduling his visit with a neurologist; and (3) failed to obtain

31

an MRI sooner. The undisputed material facts reveal that Dr. Turner-Foster evaluated and treated Plaintiff's back pain on every visit when he complained of back and leg symptoms. (See supra Section III.B.) Again, "where a significant level of care has been provided, and all that is shown is that the prisoner disagrees with the professional judgment of a physician," deliberate indifference has not been shown. Hairston, 563 F. Appx at 895.

It is true that Dr. Turner-Foster declined Plaintiff's initial requests for an MRI. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶137-38, 154-55, 175-76.) The failure to order additional diagnostic tests does not constitute deliberate indifference, but is at most medical malpractice. Johnson v. Cash, 557 F. App'x 102, 104 (3d Cir. 2013) (citing Estelle, 429 U.S. at 107.)) In any event, Dr. Turner-Foster requested approval of a neurological evaluation on Plaintiff's behalf on January 28, 2011, after Dr. Nugent recommended it. (ECF No. 131-1, ¶¶181-85.)

Dr. Lopez, the Health Services Clinical Director, is not liable under a doctrine of respondeat superior for alleged constitutional violations by prison medical staff. "A plaintiff must plead that each government official-defendant, through his or her own actions, has violation the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). She had limited personal involvement in Plaintiff's medical care at FCI Fort Dix.

Dr. Lopez rejected the first requests to schedule Plaintiff for an MRI because she felt there was insufficient evidence of medical necessity. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶¶186, 198.) Providing an MRI upon a prisoner's request is not constitutionally required. Rhines v. Bledsoe, 388 F. App'x 225, 228 (3d Cir. 2010) (finding failure to immediately order an MRI upon prisoner's request does not demonstrate deliberate indifference.) However, when Dr. Patel submitted a second request for Plaintiff to have an MRI of his spine, Dr. Lopez approved it. (ECF No. 131-1, ¶209.)

The additional delay in scheduling the MRI occurred because the provider with whom the prison contracted to perform MRIs refused because Plaintiff had metal fragments in his face, which could dislodge during an MRI. (Id., ¶¶218-29.) While waiting for approval of an MRI, Plaintiff had CT scans. (Id., ¶¶214-15. 238-40.) Ultimately, FCI Fort Dix arranged for another provider to bring MRI equipment to the prison, and Plaintiff underwent multiple MRIs. The Federal Defendants did not exhibit deliberate indifference where the delay in providing the MRI was based on a medical reason. See Monmouth County Corr. Inst. Inmates, 834 F.2d at 346 (deliberate indifference may exist where necessary medical treatment is delayed for non-medical reasons) (citation omitted).

Plaintiff also alleged the Federal Defendants were deliberately indifferent for failing to refer him to a neurologist

33

sooner. As previously discussed, Dr. Turner-Foster exercised professional medical judgment in treating Plaintiff's urological symptoms based on the recommendations of an urologist. When Dr. Nugent recommended that Plaintiff see a neurologist, Dr. Turner-Foster agreed.

Regarding Plaintiff's back pain, Dr. Turner-Foster provided pain management and other diagnostic means, such as x-rays, before resorting to a neurological evaluation. A doctor's failure to conduct an MRI upon the inmate's repeated requests does not support a claim of deliberate indifference. Dykeman v. Ahsan, 560 F. App'x 129, 131-32 (3d Cir. 2014.) At most, Plaintiff might allege malpractice against Dr. Turner-Foster and Dr. Lopez for delay in his evaluation by MRI and neurosurgical consultation.

Finally, Plaintiff alleged liability based on the failure to provide second medical opinions. Here, the core of his complaint is that he believed his spinal tumor may have been the cause of his many chronic symptoms, and this should have been investigated before pursuing other treatment options. Where a prisoner is provided continual medical care upon each visit, a plaintiff cannot show the requisite mental state for deliberate indifference. Rhines v. Bledsoe, 388 F. App'x 225, 227 (3d Cir. July 2010).

After providing and/or approving treatment and evaluation they felt was proper, and Plaintiff continued to have symptoms, Dr. Turner-Foster and Dr. Lopez ultimately sought neurological and

34

other evaluations by specialists. Plaintiff had a laminectomy of the lumbar spine, but many of his symptoms persisted. A prisoner's complaint that more could have been done to evaluate and treat his back pain does not constitute deliberate indifference where Plaintiff was diagnosed and treated with pain medication for his complaints. Estelle v. Gamble, 429 U.S. 97, 207 (1976). The failure to find the cause of an inmate's pain through x-rays and CT scans, while attempting to mitigate the symptoms, is not evidence of deliberate indifference. See e.g. Davis v. Corr. Med. Sys., 334 F. App'x 519. 521 (3d Cir. 2009).

In 2015, Plaintiff had the work-up he wanted to evaluate his pre-existing spinal tumor. Plaintiff alleged in his complaint that he knew his medical providers were pursuing the wrong course all along. (TAC, ¶238.) However, when he had a neurosurgical consultation, after multiple MRIs, to discuss removing his spinal tumor, Dr. Hanft would not schedule the surgery. (Statement of Undisputed Material Facts, ECF No. 131-1, ¶338.) Dr. Hanft opined that the spinal tumor was not the cause of Plaintiff's back symptoms. (Id., ¶339.) He also doubted the spinal tumor was the cause of Plaintiff's urological and bowel symptoms, and he would not do surgery unless other urological testing could convince him the surgery might be effective. (Id.)

In fact, Dr. Nugent had ordered urodynamic testing to rule out neurogenic bladder in April 2012. (Id., ¶¶238-20.) The testing

could not be completed because Plaintiff could not tolerate the catheter that was necessary for the testing. (<u>Id.</u>, ¶247.) Plaintiff's allegation that delay in providing him neurosurgical evaluation for his spinal tumor constituted deliberate indifference and caused him unnecessary pain or risk of permanent injury is supported only by Plaintiff's conjecture. This is insufficient to oppose the Federal Defendants' summary judgment motion.

IV.   CONCLUSION

For the reasons discussed above, the Court will grant the Federal Defendants' motion for summary judgment in the accompanying Order filed herewith.


Dated:        May 10, 2016            s/Renee Marie Bumb
                                      _____
                                      **Renée Marie Bumb**
                                      **United States District Judge**